**No. 21-3886**
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

**CONSUMERS' RESEARCH; CAUSE BASED COMMERCE, INCORPORATED; JOSEPH BAYLY; JEREMY ROTH; DEANNA ROTH; LYNN GIBBS; PAUL GIBBS,**

*Petitioners*,

**v.**

**FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,**

*Respondents.*

Petition for Review of an Order of the
Federal Communications Commission
Agency No. 96-45

**PETITION FOR REHEARING EN BANC**

C. Boyden Gray
R. Trent McCotter
  *Counsel of Record*
Jonathan Berry
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY PLLC
801 17th Street NW., Suite 350
Washington, DC 20006
202-706-5488
mccotter@boydengrayassociates.com
*Counsel for Petitioners*

## **TABLE OF CONTENTS**

TABLE OF CONTENTS .............................................................i

TABLE OF AUTHORITIES.....................................................ii

INTRODUCTION AND STATEMENT IN SUPPORT OF EN BANC REHEARING ........................................................... 1

STATEMENT ........................................................................ 7

    A.    Background on the USF.......................................... 7

    B.    Increasing Rates and Widespread Fraud. .............. 8

    C.    Prior Proceedings. .................................................. 9

REASONS FOR GRANTING REHEARING ......................... 11

    I.    The Court Should Review Whether the USF's "Unique" and Objectively Limitless Revenue-Raising Mechanism Violates the Nondelegation Doctrine.................................... 11

        A.    Uniqueness................................................... 12

        B.    Absence of a Limit on Revenue-Raising. ..................... 13

        C.    Multi-Layer Delegation.................................. 17

        D.    The USF Collects Taxes. ................................. 18

    II.    The Court Should Review the FCC's Delegation of USF Authority to the Private Company USAC. ........................... 19

CONCLUSION ...................................................................... 21

CERTIFICATE OF COMPLIANCE........................................ 23

CERTIFICATE OF SERVICE................................................. 24

# <u>TABLE OF AUTHORITIES</u>

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935) ................................................................... 18

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
51 F.4th 616 (5th Cir. 2022) ..................................................... 19

*Consumers' Rsch. v. FCC*,
63 F.4th 441 (5th Cir. 2023) ............................... 10, 11, 12, 14

*Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43 (2015) ..................... 21

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ................................................................... 17

*Gun Owners of Am., Inc. v. Garland*,
992 F.3d 446 (6th Cir. 2021) ....................................................... 6

*Hedgepeth v. Tennessee*,
215 F.3d 608 (6th Cir. 2000) ..................................................... 18

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
448 U.S. 607 (1980) ..................................................................... 6

*J.W. Hampton, Jr. & Co. v. United States*,
276 U.S. 394 (1928) ................................................................... 14

*In re MCP No. 165*, 20 F.4th 264 (6th Cir. 2021) ................................... 1

*Mistretta v. United States*, 488 U.S. 361 (1989) ................................... 13

*NCTA v. United States*, 415 U.S. 336 (1974) ............................... 3, 13, 14

*Oklahoma v. United States*, 62 F.4th 221 (6th Cir. 2023) ..................... 21

*Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009) ............... 16

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) ............................... 2, 12

*Sierra Club v. Lynn*, 502 F.2d 43 (5th Cir. 1974) ................................. 21

*Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212 (1989)......... 14, 15, 18, 19

*Tex. Off. of Pub. Util. Couns. v. FCC*,
    183 F.3d 393 (5th Cir. 1999)............................................. 16

*Tex. Off. of Pub. Util. Couns. v. FCC*,
    265 F.3d 313 (5th Cir. 2001).................................... 4, 11, 15

*Texas v. Rettig*, 987 F.3d 518 (5th Cir. 2021) ....................................... 20

*Texas v. Rettig*, 993 F.3d 408 (5th Cir. 2021) ....................................... 20

*Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*,
    5 F.4th 666 (6th Cir. 2021) ........................................... 1, 3, 6

*Trafigura Trading LLC v. United States*,
    29 F.4th 286 (5th Cir. 2022) ............................................. 19

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001)..................... 4, 15

## Constitution and Statutes

U.S. Const. art. I, § 8.............................................................. 12

47 U.S.C. § 254(b) ............................................. 4, 7, 11 15, 16

47 U.S.C. § 254(c) ................................................... 7, 11, 16

47 U.S.C. § 254(e) ........................................................... 16

## Other Authorities

47 C.F.R. § 54.709 ................................................................ 8, 9

Barbara A. Cherry & Donald D. Nystrom, *Universal Service
    Contributions: An Unconstitutional Delegation of Taxing
    Power*, 2000 L. Rev. Mich. St. U. Det. C.L. 107 (2000) .....................5

Philip Hamburger, Is Administrative Law Unlawful?
    (2014)................................................................................. 18

John Harrison, *Executive Administration of the Government's Resources and the Delegation Problem*, in The Administrative State Before the Supreme Court (Peter J. Wallison & John Yoo eds. 2022) .......................................... 16

Ronald J. Krotoszynski, Jr., *Reconsidering the Nondelegation Doctrine: Universal Service, the Power to Tax, and the Ratification Doctrine*, 80 Ind. L.J. 239 (2005) ..................................... 9

## INTRODUCTION AND STATEMENT IN SUPPORT OF EN BANC REHEARING

The Founders "separated powers within the Federal Government," and "[t]hat is the equilibrium the Constitution demands." *Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 673 (6th Cir. 2021) (Thapar, J., concurring). "[W]hen one branch impermissibly delegates its powers to another, that balance is broken." *Id.* This structural separation of powers is "the true mettle of the U.S. Constitution." *In re MCP No. 165*, 20 F.4th 264, 269 (6th Cir. 2021) (Sutton, C.J., joined by Kethledge, Thapar, Bush, Larsen, Nalbandian, Readler, and Murphy, JJ., dissenting from the denial of initial hearing en banc).

Petitioners raise core separation-of-powers challenges to the Federal Communications Commission's Universal Service Fund (USF or Fund), which collects nearly *$10 billion* every year—25 times the FCC's annual budget—by imposing a tax on consumers' monthly phone bills. But unlike all other general welfare or taxing programs, "Congress neither capped the amount that the FCC may raise in contributions for the Fund nor imposed a formula for how to calculate the contributions to the Fund." Addendum ("Opinion") at 17.

1

The FCC can thus perpetually self-raise billions of dollars in taxes without meaningful statutory limits. If this historically unique scheme were replicated elsewhere, Congress would never have to appropriate funds or pass a budget again. Congress could even let the IRS determine for itself the income tax rates imposed on all Americans.

The novel delegation to an agency of a broad and perpetual taxing power should have raised alarm bells. After all, "[p]erhaps the most telling indication of a severe constitutional problem with an executive entity is a lack of historical precedent to support it." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2201 (2020).

The panel opinion, however, wholeheartedly endorsed the USF scheme, holding that broad and vague delegations giving federal agencies the power to raise billions of dollars in revenue are perfectly acceptable "'in our increasingly complex society.'" Op.16, 23.

But the decision of how much money to raise from the general public for a multi-billion-dollar welfare program is not some trifling technical detail for agency bureaucrats. The revenue-raising power is at the core of Congress's legislative power under Article I, and thus Congress itself must set that limit. The "original meaning, history, and

structure of our Constitution" thus confirm that it is no answer to say—as the Opinion did—that "modern society is too complex to be run by legislators—better to leave it to the agency bureaucrats." *Tiger Lily*, 5 F.4th at 674 (Thapar, J., concurring).

The Opinion disregarded the Supreme Court's admonition that allowing agencies to extract money limited only by vague statutory phrases—like the "'public policy or interest served'"—raises the specter of "forbidden delegation of legislative power." *NCTA v. United States*, 415 U.S. 336, 341–42 (1974). By ignoring *NCTA*, the Opinion could proceed to deem it a mere coincidence that the Supreme Court has approved revenue delegations *only* where there was an objective statutory limit on the executive's ability to self-fund.

Moreover, the nondelegation violation here is worsened by its unique "dual-layer" status: Congress not only gave the FCC authority to raise money for "universal service," it also gave the FCC the power to *redefine* universal service and raise money for that expanded scope.

But in response, the Opinion turned the nondelegation doctrine on its head by holding that this dual-layer delegation "reflects the exact rationale that underpins the nondelegation doctrine." Op.23. Of course,

the nondelegation doctrine exists to *prevent* the executive branch from being able to redefine its own scope of taxing power.

In the face of such broad delegated power, the Opinion claimed the FCC's revenue-raising power was limited by a list of statutory aphorisms labeled "universal service principles." 47 U.S.C. § 254(b). But *the FCC itself* has stated those principles are "merely aspirational." *Tex. Off. of Pub. Util. Couns. v. FCC* (*"TOPUC II"*), 265 F.3d 313, 321 (5th Cir. 2001). An agency limited only by its own "aspirations" has no limit at all. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473 (2001).

It gets worse. The FCC has delegated USF operations to a *private* corporation, the Universal Service Administrative Company (USAC), which is led by a group of self-described industry "interest groups." Each quarter, USAC proposes the new USF tax, which is automatically "deemed approved" if the FCC Commissioners do nothing during the exceedingly short window for review. The FCC has never substantively changed USAC's take-it-or-leave-it proposals over the last 25 years and does not engage even in the pretense of review.

The Opinion rejected Petitioners' private nondelegation challenge. But if a private company can perpetually collect billions of dollars in

taxes pursuant to a statute with no "formula" or "cap," Op.17, and without the FCC Commissioners lifting a finger, nothing remains of the political accountability mandated by the private nondelegation doctrine.

The Opinion is thus worthy of *en banc* review not only because it conflicts with binding precedent but also because of the significance of the issues involved. As scholars have noted, "[u]nlike the thousands of responsibilities carried out by governmental agencies on behalf of Congress, this delegation is unique because of the unfettered power given to the FCC in defining the scope of universal service, and because Congress delegated the power to levy a tax to pay for the service with no limits, knowing that the end user, the American public, would ultimately be saddled with the burden." Barbara A. Cherry & Donald D. Nystrom, *Universal Service Contributions: An Unconstitutional Delegation of Taxing Power*, 2000 L. REV. MICH. ST. U. DET. C.L. 107, 110 (2000).

As expected given the lack of meaningful political checks, the USF taxing rate has skyrocketed from around 2% to over 30%. "Of all the separation-of-powers concerns identified, perhaps this is the most troubling: the bureaucrats at the agency [and private company USAC] are unaccountable to the public." *Gun Owners of Am., Inc. v. Garland*,

992 F.3d 446, 466 (6th Cir. 2021). "By shifting responsibility to a less accountable branch [and to a private company], Congress protects itself from political censure—and deprives the people of the say the framers intended them to have." *Tiger Lily*, 5 F.4th at 675 (Thapar, J., concurring).

Courts "ought not to shy away from [their] judicial duty to invalidate unconstitutional delegations," and "these are surely the cases in which to do it." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 686–87 (1980) (Rehnquist, J., concurring in the judgment).

\* \* \*

This case thus raises two questions worthy of *en banc* review: (1) whether the nondelegation doctrine allows Congress to establish a unique revenue raising mechanism containing no objective ceiling on the amount that a federal agency can self-raise via a tax paid by millions of consumers; and (2) whether the private nondelegation doctrine allows a federal agency to rubber stamp a private company's operation of a nearly-$10-billion-a-year welfare fund.

## STATEMENT

### A. BACKGROUND ON THE USF.

The Telecommunications Act of 1996 established the USF and delegated its operation to the FCC. 47 U.S.C. § 254. As its name indicates, the USF is designed to facilitate broad access to telecommunications services, typically via subsidies that benefit the general public.

Rather than pay for this welfare program with an appropriation, Congress authorized the FCC to raise money for "universal service," with no cap, formula, or other meaningful or objective restrictions. Congress provided universal service "principles," § 254(b), but they are all couched—like much of § 254—as things the FCC "should" do. The FCC is even authorized to add new "universal service principles" as often as it wishes, § 254(b)(7), and can redefine the "evolving" scope of "universal service," § 254(c).

The FCC has largely off-boarded this process to the private company USAC. Each quarter, USAC proposes how many billions of dollars it wants for "universal service," then the FCC ministerially calculates that figure into a tax rate based on expected interstate and international telephone revenues for the upcoming quarter, with the

resulting tax rate euphemistically called a quarterly "Contribution Factor." *See* 47 C.F.R. § 54.709(a).

This rate is automatically "deemed approved" by the FCC unless the Commissioners act within 14 days of its publication. § 54.709(a)(3). The charge generally appears on customers' phone bills as the "Universal Service Fund Fee." USAC collects the contributions and then chooses how to disburse the funds.

## B.   INCREASING RATES AND WIDESPREAD FRAUD.

Without congressionally imposed limits or accountability, the USF tax has predictably skyrocketed. In the second quarter of 2000, the rate was 5.7%, but by 2021 that figure had jumped to the unprecedented level of 33.4%, with $2.5 billion collected in a single quarter. For fourth quarter 2021—at issue in this suit—the rate was 29.1%. The USF now collects roughly 25 times the FCC's annual budget.

Given its lack of accountability, the USF unsurprisingly has exhibited a history of extensive waste and abuse. *See* Pet.Br.19–22. And the USF levies a flat tax, meaning a "single, low-income mother, living in the Bronx, with a cell phone for personal safety, pays 10% or more of her monthly wireless telephone bill to support universal service for wealthy

Montana residents living on ranchettes." Ronald J. Krotoszynski, Jr.,
*Reconsidering the Nondelegation Doctrine: Universal Service, the Power
to Tax, and the Ratification Doctrine*, 80 IND. L.J. 239, 314 (2005).

## C. PRIOR PROCEEDINGS.

Petitioners comprise several organizations and individuals, all of
whom are adversely affected by USF charges. For example, Petitioner
Joseph Bayly is a pastor and editor who resides in Ohio with his wife and
six children. He provides his family's sole income but has to pay into the
USF every month via his phone bill.

In Fall 2021, Petitioners challenged the proposed Fourth Quarter
2021 Contribution Factor of 29.1%, which was "deemed approved by the
Commission," even though the Commission itself took no action. *See* 47
C.F.R. § 54.709(a)(3). This occurred just days before the rate became
effective on October 1, 2021.

Petitioners sued in this Court, and the panel issued its Opinion on
May 4, 2023. It correctly concluded the suit was timely, Op.11–15, but
then upheld the USF's revenue-raising mechanism against Petitioners'
nondelegation challenges.

The Opinion relied extensively on a recent Fifth Circuit decision that acknowledged the USF utilizes "a unique revenue raising mechanism," *Consumers' Rsch. v. FCC*, 63 F.4th 441, 450 (5th Cir. 2023), where "Congress neither capped the amount that the FCC may raise in contributions for the Fund nor imposed a formula for how to calculate the contributions to the Fund," Op.17.

But the Opinion rejected Petitioners' nondelegation challenge, concluding that "'in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives.'" Op.16.

The Opinion found that the FCC's ability to change the definition of "universal service" raised no nondelegation concerns, Op.23, and concluded it was insignificant that each of the Supreme Court decisions upholding revenue-raising delegations had involved statutes with objective limitations on revenue-raising, Op.17–19.

The Opinion found no private nondelegation violation, concluding that "rubber stamp[ing]" a private entity's proposals is an exercise of the FCC's "policymaking discretion … '*not* to act.'" Op.29.

## REASONS FOR GRANTING REHEARING

**I.  THE COURT SHOULD REVIEW WHETHER THE USF'S "UNIQUE" AND OBJECTIVELY LIMITLESS REVENUE-RAISING MECHANISM VIOLATES THE NONDELEGATION DOCTRINE.**

The Court should review the constitutionality of the USF's "unique revenue raising mechanism," 63 F.4th at 450, which now generates 25 times the FCC's annual budget. Several aspects demonstrate why this scheme is so problematic:

- Rather than appropriate money, Congress allows the FCC to raise money directly, with the general public footing the bill, but "Congress neither capped the amount that the FCC may raise in contributions for the Fund nor imposed a formula for how to calculate the contributions to the Fund." Op.17.

- The statutory "universal service principles"—which ostensibly might limit the FCC—are, in the FCC's own words, "merely aspirational" and thus impose no substantive restrictions. *TOPUC II*, 265 F.3d at 321.

- The FCC itself can add *new* "universal service principles" and *redefine* "universal service"—and then raise money to cover that expanded scope. 47 U.S.C. § 254(c)(1), (b)(7).

11

- The USF charges are not just any revenue but are "taxes" under relevant precedent, and taxation is a power belonging exclusively to Congress. *See* U.S. Const. art. I, § 8.

Each of these factors demonstrates why *en banc* review is warranted.

## A.    UNIQUENESS.

The Supreme Court has held that "[p]erhaps the most telling indication of a severe constitutional problem with an executive entity is a lack of historical precedent to support it." *Seila Law*, 140 S. Ct. at 2201 (cleaned up). In rejecting Petitioners' nondelegation challenges, the Opinion repeatedly cited—more than 20 times—a recent Fifth Circuit decision that openly acknowledged the USF's historically "unique revenue raising mechanism." 63 F.4th at 450.[1] Given this, the Opinion should have scrutinized the USF funding scheme even more stringently. But as demonstrated next, it did nothing of the sort.

---

[1] Petitioners have sought rehearing *en banc* in the Fifth Circuit, which recently ordered the FCC to file a response to the *en banc* petition.

### B.    ABSENCE OF A LIMIT ON REVENUE-RAISING.

The Opinion's intelligible-principle analysis rested on several notable errors that contradict precedent or the FCC's own long-held positions.

*First*, the Opinion claimed that "we apply one universal intelligible-principle test regardless of the type of statute at issue." Op.17. But the Supreme Court has held that the inquiry turns on "'the extent and character'" of the particular power delegated. *Mistretta v. United States*, 488 U.S. 361, 372 (1989). Thus, there always must be an "intelligible principle," but what *suffices* as an intelligible principle will vary based on context.

The Opinion's misunderstanding of this distinction led it to rely on distinguishable cases upholding vague delegations of scientific matters, while simultaneously ignoring or discounting cases that involved agency revenue-raising, as here. Op.16–20. And the Supreme Court has held there is a difference between the two.

In *NCTA*, for example, the Court held that giving an agency the power to raise money based only on vague statutory phrases like "'public policy or interest served, and other pertinent facts'" raises the specter of

13

"forbidden delegation of legislative power" by "carr[ying] [the] agency far from its customary orbit and put[ting] it in search of revenue in the manner of an Appropriations Committee of the House." *NCTA*, 415 U.S. at 341–42. Those vague phrases may pass nondelegation muster in scientific contexts, but not when it comes to revenue-raising.

Yet the Opinion did not cite *NCTA* even once. That allowed the Opinion to conclude it was mere coincidence that every Supreme Court decision approving revenue-raising delegations did so only when there was some form of statutorily imposed objective limit on the executive's ability to self-fund. Op.17–19; *see J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 401 (1928) (imposed duty could not vary more than 50% from the statutory figure); *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 215 (1989) (agency could not raise more than 105% of the amount already appropriated by Congress).

*NCTA* reflects the original understanding of nondelegation and confirms Congress cannot off-board the policy decision of how much money to raise for a nationwide welfare program. *See* 63 F.4th at 449 n.4. But the USF has nothing remotely like an objective limit, as the Opinion acknowledged. Op.17. That distinction mattered under *NCTA*, *J.W.*

14

*Hampton*, and *Skinner*. The Opinion thus erred by disregarding that distinction and concluding there could be no nondelegation violation unless the FCC had "'absolute[]' discretion." Op.23.

*Second*, the Opinion claimed to identify sufficient limits in § 254 only by adopting interpretations of that statute that courts and the FCC itself have steadfastly rejected.

For example, parroting the Fifth Circuit's decision, the Opinion said § 254(b) imposes substantive "'require[ments]'" "'to ensure that telecommunications services are: (1) of decent quality and reasonably priced; (2) equally available,'" etc. Op.21. The Opinion labeled these aphorisms—which are all couched as things the FCC "*should*" do—as "provid[ing] comprehensive and substantial guidance and limitations." Op.20–21. That should come as a surprise to the FCC itself, which has long argued those same § 254(b) principles are so vague and amorphous that they are "merely aspirational." *TOPUC II*, 265 F.3d at 321. And critically, the Supreme Court has held that such precatory limitations are no limitation at all because "an agency's voluntary self-denial" is irrelevant to a nondelegation challenge. *Whitman*, 531 U.S. at 473.

The Opinion also believed that § 254 requires the FCC to raise only just enough money to "achieve the purposes of universal service," in effect setting a "soft cap." Op.25. But the D.C. Circuit, the Fifth Circuit, and the *FCC itself* have agreed that "nothing in the statute" requires that "universal service support must equal the actual costs incurred." *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 412 (5th Cir. 1999); *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1102 (D.C. Cir. 2009). The FCC cannot have it both ways.

The Opinion also repeatedly cited § 254(c) and (e), which pertain to *spending* USF money, Op.23–25, but again that reliance is misplaced. The FCC itself has agreed that "'spending decision[s]'" are "'irrelevant to this case.'" Reply.Br.23n.7. That is because the challenge here is to the FCC's ability to raise money from the general population in the first place, not the decision of where to *spend* money afterwards—and those are distinct inquiries.[2]

---

[2] *See* John Harrison, *Executive Administration of the Government's Resources and the Delegation Problem*, in THE ADMINISTRATIVE STATE BEFORE THE SUPREME COURT (Peter J. Wallison & John Yoo eds. 2022).

Ultimately, Congress is the expert at making the policy judgment of how much money to raise for the USF. It was Congress's constitutional obligation to impose such a limit. It failed to do so.[3]

### C.  MULTI-LAYER DELEGATION.

Petitioners argued that the FCC's additional statutory authority to *redefine* the already-vague definition of "universal service" and add *new* "universal service principles" makes this a rare "multi-layer" delegation that should be deemed unconstitutional on that basis alone. The Supreme Court has emphasized in analogous contexts that "[t]he added layer … makes a difference" from a constitutional perspective. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 495 (2010).

In response, the Opinion turned the nondelegation doctrine on its head by claiming that giving the FCC the power to perpetually redefine its own authority to raise money "reflects the exact rationale that underpins the nondelegation doctrine." Op.23. But the nondelegation doctrine exists precisely to *prevent* such schemes. The Supreme Court

---

[3] The Opinion also cited "Congress's consistent intentions" as somehow providing an intelligible principle, Op.23, but the modern USF is radically broader than its historical predecessors, Op.3–4.

itself has labeled multi-layer delegations as especially egregious. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 538–39 (1935).

### D.    THE USF COLLECTS TAXES.

Congress's off-boarding of its revenue-raising power is all the worse because it involves the raising of *taxes*. Pet.Br.48–62. Hard-fought tradition dating back to England established that "taxes were legislative" and thus must be determined by the legislature itself, not by the executive. Philip Hamburger, IS ADMINISTRATIVE LAW UNLAWFUL? 63 (2014).

A tax for constitutional purposes is typically a charge where "some of the administrative costs at issue inure[] to the benefit of the public." *Skinner*, 490 U.S. at 223; *see Hedgepeth v. Tennessee*, 215 F.3d 608, 612 (6th Cir. 2000) ("classic tax" is a charge imposed "upon many, or all, citizens" that "raises money, contributed to a general fund, and [is] spent for the benefit of the entire community"). But *nearly all* of the universal service charges "inure[] to the benefit of the public." *Skinner*, 490 U.S. at 223; Op.25. They are therefore taxes.

These are not mere "fees," which represent "a 'value-for-value' transaction, in which a feepayer pays the fee to receive a service or

benefit in return, and is thus better off as a result of the transaction." *Trafigura Trading LLC v. United States*, 29 F.4th 286, 294 (5th Cir. 2022) (opinion of Ho, J.). For the USF, most contributors receive nothing in return—and certainly no proportional "value-for-value."[4]

## II. THE COURT SHOULD REVIEW THE FCC'S DELEGATION OF USF AUTHORITY TO THE PRIVATE COMPANY USAC.

The Opinion's rejection of Petitioners' private nondelegation challenge is also worthy of *en banc* review. Each quarter, USAC's proposed taxing rate is automatically "deemed approved" by the FCC after 14 days, without the Commissioners lifting a finger, typically just days before the new quarter begins.

Jurists have harshly criticized such "perpetual self-funding scheme[s]." *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 641 (5th Cir. 2022). But the Opinion gave a ringing endorsement of them.

The Opinion claimed the FCC "'only uses USAC's proposals after independent consideration of the collected data and other relevant information.'" Op.29. There is zero evidence of this. The FCC does not

---

[4] *Skinner* upheld a delegation of taxing power, but the statute there mathematically capped the agency's revenue-raising power, unlike the USF statute. Pet.Br.48–62.

even engage in the *pretense* of review. It never issues a separate approval document nor responds to comments filed by the public. And because this "approval" process plays out on the eve of each new quarter, the FCC has no choice but to accept whatever USAC proposes. The Opinion never addressed these points. It's no surprise that the FCC has *never* substantively changed USAC's proposals over 25 years.

For support, the Opinion cited the arrangement upheld by the Fifth Circuit in *Texas v. Rettig*, 987 F.3d 518 (5th Cir. 2021), Op.27, albeit over substantial dissent, *Texas v. Rettig*, 993 F.3d 408, 409 (5th Cir. 2021) (Ho, J., joined by Jones, Smith, Elrod, and Duncan, JJ., dissenting from denial of rehearing *en banc*). But USAC's role here puts to shame the private delegation in *Rettig*, which required private actuaries to approve certain figures. This is no "small part of the approval process," *Rettig*, 987 F.3d at 533, but instead a private company setting the taxing rate that now yields 25 times the FCC's annual budget, with no evidence the FCC reviews the substance of that rate. It is the FCC—not USAC—that performs the "ministerial" functions here. Op.27.

The Opinion concluded the FCC could "rubber stamp" USAC's proposals because doing so is an exercise of the FCC's "policymaking

discretion … '*not* to act.'" Op.29. But letting private proposals *automatically* become binding is the very definition of a private nondelegation violation. *See Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974) (cited favorably in *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023)) (agency must "independently perform its reviewing, analytical and judgmental function").

* * *

Under the Opinion, there is nothing stopping agencies from handing over vast powers to private companies run by industry interest groups, who then decide how many billions of dollars in "contributions" they want to extract from the general public and redistribute to industry cronies. "[T]here is not even a fig leaf of constitutional justification" for such a scheme, yet the Opinion wholeheartedly endorsed it. *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring).

## **CONCLUSION**

The Court should grant rehearing *en banc*.

May 10, 2023                    Respectfully submitted,

                                /s/ R. Trent McCotter
                                C. Boyden Gray
                                R. Trent McCotter
                                  *Counsel of Record*
                                Jonathan Berry
                                Michael Buschbacher
                                Jared M. Kelson
                                BOYDEN GRAY PLLC
                                801 17th Street NW, Suite 350
                                Washington, DC 20006
                                202-706-5488
                                mccotter@boydengrayassociates.com
                                *Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this petition complies with the type-volume limitations of Federal Rule of Appellate Procedure 35(b)(2)(A) because it contains 3,889 words, excluding the parts of the petition exempted by Rule 32(f). This petition complies with the typeface and typestyle requirements of Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

<u>/s/ R. Trent McCotter</u>
R. Trent McCotter
Boyden Gray PLLC
801 17th St NW, #350
Washington, DC 20006
(202) 706-5488

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF. All parties in this case are represented by counsel consenting to electronic service.

/s/ R. Trent McCotter
R. Trent McCotter
Boyden Gray PLLC
801 17th St NW, #350
Washington, DC 20006
(202) 706-5488

# ADDENDUM

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0093p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CONSUMERS' RESEARCH; CAUSE BASED COMMERCE, INC.;
JOSEPH BAYLY; JEREMY ROTH; DEANNA ROTH; LYNN GIBBS;
PAUL GIBBS,

          *Petitioners,*

    *v.*

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF
AMERICA,

          *Respondents,*

BENTON INSTITUTE FOR BROADBAND AND SOCIETY; CENTER
FOR MEDIA JUSTICE dba MediaJustice; COMPETITIVE
CARRIERS ASSOCIATION; NATIONAL DIGITAL INCLUSION
ALLIANCE; NATIONAL TELECOMMUNICATIONS COOPERATIVE
ASSOCIATION dba NTCA; SCHOOLS, HEALTH & LIBRARIES
BROADBAND COALITION; USTELECOM,

          *Intervenors.*

> No. 21-3886

_____

Petition for Review of an Order of the Federal Communications Commission;
No. DA21-1134.

Argued: March 17, 2023

Decided and Filed: May 4, 2023

Before: MOORE, CLAY, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** R. Trent McCotter, BOYDEN GRAY & ASSOCIATES, Washington, D.C., for Petitioners. James M. Carr, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Respondents. **ON BRIEF:** R. Trent McCotter, BOYDEN GRAY & ASSOCIATES, Washington, D.C., for Petitioners. James M. Carr, Jacob M. Lewis, FEDERAL

COMMUNICATIONS COMMISSION, Washington, D.C., Gerard J. Sinzdak, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents.  Andrew Jay Schwartzman, Washington, D.C., Jennifer Tatel, WILKINSON BARKER KNAUER, LLP, Washington, D.C., for Intervenors.  Albert H. Kramer, PUBLIC KNOWLEDGE, Washington, D.C., Matthew S. Hellman, JENNER & BLOCK LLP, Washington, D.C., Eric P. Gotting, KELLER AND HECKMAN LLP, Washington, D.C., Corbin K. Barthold, TECHFREEDOM, Washington, D.C., Jeffrey S. Beelaert, STEIN MITCHELL BEATO & MISSNER LLP, Washington, D.C., for Amici Curiae.

————————————

## OPINION

————————————

KAREN NELSON MOORE, Circuit Judge.  For nearly a century, Congress has aimed to provide all Americans with universal access to telecommunications services.  Congress issued this universal-service mandate in the Communications Act of 1934 and elaborated upon it in the Telecommunications Act of 1996.  The Federal Communications Commission ("FCC") implemented the universal-service mandate by establishing the Universal Service Fund ("USF" or "the Fund"), which now consists of four different program mechanisms to "help[] compensate telephone companies or other communications entities for providing access to telecommunications services at reasonable and affordable rates throughout the country, including rural, insular and high costs areas, and to public institutions."  Fed. Commc'ns Comm'n, *Glossary of Telecommunications Terms: Universal Service*, https://www.fcc.gov/general/glossary-telecommunications-terms; *see also* 47 U.S.C. § 254.  To pay for these universal-service pursuits, Congress requires that certain telecommunications carriers fund these efforts.  47 U.S.C. § 254(d).  Thus, on a quarterly basis, the FCC publishes the percentage of "interstate and international end-user telecommunications revenue" that covered telecommunications carriers must contribute to the Universal Service Fund's programs, known as the quarterly contribution factor.  47 C.F.R. § 54.709(a)(3).  Petitioners—a group of consumers, a nonprofit organization, and a carrier—challenge this statutory arrangement as violating the nondelegation doctrine.  They further allege that the role of a private entity in administering the Universal Service Fund violates the private-nondelegation doctrine. We disagree and **DENY** the petition for review.

# I. BACKGROUND

## A. Congress's Goal of Universal Service

### 1. The Creation of the FCC, the Universal-Service Mandate, the Origins of the Universal Service Fund, and the Telecommunications Act of 1996

Congress created the FCC in 1934 and directed it to make available "communication by wire and radio . . . so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, [through] a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151 (as amended). Congress charged the FCC with "securing a more effective execution of this policy." *Id.* The FCC's creation reflected Congress's desire to make these services universal and its universal-service mandate. Since 1934, "[u]niversal service has been a fundamental goal of federal telecommunications regulation." *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 614 (5th Cir. 2000); *see also* FCC Br. at 4–5.

The FCC initially pursued the universal-service mandate by providing explicit and implicit subsidies. *Tex. Off. of Pub. Util. Couns. v. FCC* (*TOPUC I*), 183 F.3d 393, 406 (5th Cir. 1999). "Explicit subsidies provide carriers or individuals with specific grants that can be used to pay for or reduce the charges for telephone service." *Id.* The FCC provided implicit subsidies by adjusting some customers' rates to subsidize the rates of other customers. *Id.*; *see also* FCC Br. at 5; Pet'rs Br. at 10–11. These implicit subsidies worked in the monopoly environments that made up the industry at the time because carriers could offer above-cost and below-cost rates only if other carriers were not offering at-cost rates. *TOPUC I*, 183 F.3d at 406; FCC Br. at 5; Pet'rs Br. at 10–11. Opening the market to competition in the 1980s and 1990s necessitated a new approach for promoting universal service. *See TOPUC I*, 183 F.3d at 406; FCC Br. at 5; Pet'rs Br. at 10–11.

The FCC created the Universal Service Fund to ease the transition to a competitive market and address universal service in high-cost areas. *See In re Amend. of Part 67 of the Comm'n's Rules & Establishment of a Joint Bd.*, 96 F.C.C.2d 781, 795–800 (1983); Brief for

USTelecom et al. as Intervenors Supporting Respondents, No. 21-3886, at 3; *Rural Tel. Coal. v. FCC*, 838 F.2d 1307, 1311 (D.C. Cir. 1988) ("The Commission . . . proposes to create a federal 'Universal Service Fund' ('Fund') to 'ensure that telephone rates are within the means of the average subscriber in all areas of the country, thus providing a foundation on which the states can build to develop programs tailored to their individual needs.'" (quoting 96 F.C.C.2d at 795)). *Rural Telephone Coalition* explained that "the [USF] was proposed in order to further the objective of making communication service available to all Americans at reasonable charges" and upheld the creation of the USF as "within the Commission's statutory authority." 838 F.2d at 1315. The FCC also established other programs to assist low-income communities, known as Link Up and Lifeline. Congressional Research Service, *Universal Service Fund: Background and Options for Reform*, at 2–3 (updated Oct. 25, 2011) [hereinafter *CRS USF Report*]. These programs operated in connection with the Fund. *See* Fed. Commc'ns Comm'n, *Universal Service Fund*, https://www.fcc.gov/general/universal-service-fund (last visited May 4, 2023) [hereinafter *FCC: Universal Service Fund*].

In 1996, in the wake of the Bell Telephone System's breakup when subsidies were no longer possible in a competitive market, Congress elaborated upon its universal-service mandate and enacted the Telecommunications Act of 1996, which amended the Communications Act of 1934. Telecommunications Act of 1996, Pub. L. 104–104, 110 Stat. 56 (codified as amended in scattered sections of 47 U.S.C.); *see also* FCC Br. at 6; *TOPUC I*, 183 F.3d at 406. Among other things, § 254 of the Telecommunications Act (codified in 47 U.S.C. § 254) recognized preexisting and additional priorities of universal service and called for "specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service." *Id.* § 254(b)(5); *see also id.* § 254(b)(3), (6). This gave rise to today's Universal Service Fund and its four specific mechanisms, which are also referred to as programs or funds. *See In re Fed.-State Joint Bd. on Universal Serv.*, 12 F.C.C. Rcd. 8776, 8780 (1997); *Vt. Pub. Serv. Bd. v. FCC*, 661 F.3d 54, 56–57 (D.C. Cir. 2011); *Tex. Off. of Pub. Util. Couns. v. FCC*, 265 F.3d 313, 318–19 (*TOPUC II*) (5th Cir. 2001) (explaining "[t]he 1996 Act . . . required that the implicit subsidy system of rate manipulation be replaced with explicit subsidies for universal service" and the FCC responded by "replac[ing implicit subsidies] with an explicit universal service fund"); *CRS USF Report*, *supra*, at 2 ("A new federal Universal Service Fund (USF or Fund) was established

in 1997 to meet the specific objectives and principles contained in the 1996 act."); *FCC: Universal Service Fund*, *supra*.

"Congress passed § 254 to ensure the facilitation of broad access to telecommunications services across the country." *Consumers' Rsch. v. FCC*, 63 F.4th 441, 445 (5th Cir. 2023); *see also* 47 U.S.C. § 254. "The USF accomplishes this goal by raising funds which are later distributed to people, entities, and projects to expand and advance telecommunications services in the nation." *Consumers' Rsch.*, 63 F.4th at 445. The USF consists of four mechanisms: (1) the Connect America Fund servicing rural areas (previously named "High-Cost Support"), 47 C.F.R. §§ 54.302–54:322, 54.801–54.1515; (2) the Lifeline Program servicing low-income consumers, *id.* §§ 54.400–54.423; (3) the Schools and Libraries Support program ("E-Rate"), *id.* §§ 54.500–54.523; and (4) the Rural Health Care Support program, *id.* §§ 54.600–54.633.[1] Fed. Commc'ns Comm'n, *Universal Service*, https://www.fcc.gov/general/universal-service (last visited May 4, 2023) [hereinafter *FCC: Universal Service*]; *Vt. Pub. Serv. Bd.*, 661 F.3d at 56–57 ("Pursuant to [§ 254's] statutory directives, the Commission established the Universal Service Program, which consists of four separate funds[.]"); FCC Br. at 10.

Additionally, § 254 established how to fund "the[se] specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." 47 U.S.C. § 254(d). Congress also required a means for federal-state engagement through a Federal-State Joint Board, identified the principles that should guide the task of providing universal service, instructed how to determine which services fall therein, and provided the funding mechanism. We begin below with an overview of § 254.

---

[1]The Connect America Fund addresses rural service access by offering support to "certain qualifying telephone companies that serve high-cost areas, thereby ensuring that the residents of these regions have access to reasonably comparable service at rates reasonably comparable to urban areas." *FCC: Universal Service*, *supra*. The Lifeline Program "assists low-income customers by helping to pay for monthly telephone charges so that telephone service is more affordable." *Id.* The Schools and Libraries Support program provides various "telecommunications services[,] . . . [i]nternet access, and" equipment "to eligible schools and libraries." *Id.* Finally, the "Rural Health Care Support [program] allows rural health care providers to pay rates for telecommunications services similar to those of their urban counterparts, making telehealth services affordable, and also subsidizes Internet access." *Id.*

### 2. Section 254 of the Telecommunications Act of 1996

<u>Directing the Use of a Federal-State Joint Board</u>

Subsection 254(a)(1) requires the use of a Federal-State Joint Board ("the Joint Board")**[2]** "to coordinate federal and state regulatory interests." *TOPUC I*, 183 F.3d at 406. As part of the initial implementation of the 1996 Act, Congress required that, after a period of notice and comment, the Joint Board make recommendations initially to the FCC regarding how to achieve the Act's universal-service provisions by the provided statutory deadlines. *Id.*; 47 U.S.C. § 254(a)(1). Section 254 specifically required that the Joint Board issue recommendations on "the definition of the services that are supported by Federal universal service support mechanisms" by the statutory deadline. 47 U.S.C. § 254(a)(1).

After the initial implementation, Congress directed the Joint Board to remain involved in making recommendations pertaining to universal service. Section 254 states that the Joint Board may make "subsequent recommendations . . . on universal service" to the FCC. *Id.* § 254(a)(2). As detailed below, Congress identifies the principles that must guide both the Joint Board when making recommendations regarding and the FCC in making "policies for the preservation and advancement of universal service." *Id.* § 254(b). After identifying six principles for universal service, § 254(b) empowers the Joint Board and the FCC to determine other "necessary and appropriate" principles. *Id.* § 254(b)(7). Congress also permits the Joint Board to recommend to the FCC "modifications in the definition of the services that are supported by Federal universal service support mechanisms." *Id.* § 254(c)(2).

<u>Identifying Seven Principles to Guide Universal-Service Policies</u>

In § 254(b), Congress identified "[u]niversal service principles" and required that "[t]he Joint Board and the Commission *shall* base policies for the preservation and advancement of universal service on the following principles." *Id.* (emphasis added). Subsection 254(b) lists the following principles:

---

**[2]**The Joint Board is comprised of three FCC Commissioners, four State Utility Commissioners, and "a State-appointed utility consumer advocate" representative. 47 U.S.C. §§ 254(a)(1), 410(c).

(1) **Quality and rates**[:]  Quality services should be available at just, reasonable, and affordable rates.

(2) **Access to advanced services**[:]  Access to advanced telecommunications and information services should be provided in all regions of the Nation.

(3) **Access in rural and high cost areas**[:]  Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

(4) **Equitable and nondiscriminatory contributions**[:]  All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

(5) **Specific and predictable support mechanisms**[:]  There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

(6) **Access to advanced telecommunications services for schools, health care, and libraries**[:]  Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h).

(7) **Additional principles**[:]  Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter.

*Id.*

Defining Which Services Are Included in "Universal Service"

Congress instructed the FCC to anticipate and address evolving technologies when effectuating universal service.  Section 254 of the Act states that "[u]niversal service is an *evolving* level of telecommunications services that the Commission shall establish periodically under this section."  *Id.* § 254(c)(1) (emphasis added).  It therefore instructs that when the Joint Board makes recommendations and the FCC establishes and modifies the definition of which "services . . . are supported by Federal universal service support mechanisms," they "shall consider the extent to which such telecommunications services":

(A) are essential to education, public health, or public safety;

(B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

(C) are being deployed in public telecommunications networks by telecommunications carriers; and

(D) are consistent with the public interest, convenience, and necessity.

47 U.S.C. § 254(c)(1); *see also id.* § 254(c)(2) (discussing "[a]lterations and modifications" to the definition of services). Further, the FCC "may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h)," *id.* § 254(c)(3), which refers to the FCC's "Schools and Libraries Support" and "Rural Health Care Support" programs. *See FCC: Universal Service*, *supra*; *CRS USF Report*, *supra*, at 3–4.

<u>Funding the USF's Mechanisms Through Telecommunications Carriers' Contributions</u>

To fund the USF's mechanisms, Congress required in § 254(d) that "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." Subsection 254(d) thus requires that certain telecommunication carriers contribute to the USF.

**B. Funding and Administering the USF**

The FCC addresses § 254(d)'s funding requirement on a quarterly basis by, in essence, establishing a percentage to be applied to each covered carrier's "interstate and international end-user telecommunications revenues" in order "to calculate the amount of individual contributions" that each carrier must pay to the USF. 47 C.F.R. § 54.709(a)(3); *see also id.* § 54.709(a)(2). That percentage is known as the quarterly contribution factor. It arises from a ratio of various projections and data that the USF's administrator, Universal Service Administrative Company ("USAC"), submits to the FCC for the FCC's approval. *See id.* § 54.709(a); *Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1085–86 (D.C. Cir. 2012). USAC is a not-for-profit private organization that is structured pursuant to the FCC's regulations. *See, e.g.*, 47 C.F.R. §§ 54.701, 54.703.

USAC submits to the FCC (1) projections of the Fund's quarterly expenses (the projected demands for each mechanism and the administrative expenses) and (2) the "contribution base," which is "the total projected collected end-user interstate and international telecommunications revenues" of the covered carriers that is derived from their self-reported revenue. *See* 47 C.F.R. § 54.709(a)(2)–(3). The first projection—the Fund's demand and administrative expense projections—must be submitted by USAC to the FCC sixty days before the start of each quarter. 47 C.F.R. § 54.709(a)(3).[3] The second figure—the total contribution base—must be submitted to the FCC thirty days before the start of each quarter. *Id.*[4] The FCC then issues a Public Notice of the projections and data and includes therein its *proposed* contribution factor. *Id.* The FCC may revise USAC's projections of the Fund's quarterly expenses within this fourteen-day period. *Id.* "If the [FCC] take[s] no action within fourteen (14) days of the date of release of the public notice . . . the contribution factor shall be deemed approved by the" FCC. *Id.* Once the contribution factor is approved by the FCC, USAC applies the contribution factor to each carrier's applicable revenue, *id.*, and issues each carrier a monthly invoice, *see id.* § 54.713(b).

## C. The Fourth Quarter 2021 Universal-Service Contribution Factor

On August 2, 2021, USAC submitted to the FCC its projections for the Fund's demand and administrative expenses. *USAC Q4 2021 Projected Fund Size*. On September 1, 2021, USAC provided the FCC with the contribution base (the industry revenue projections based on the carriers' self-report data). *USAC Q4 2021 Projected Contribution Base*. On September 10, 2021, the FCC published a Public Notice regarding the Fourth Quarter 2021 Contribution Factor, which presented USAC's projections and data and the FCC's proposed contribution factor of 29.1%. Fed. Commc'ns Comm'n, *Proposed Fourth Quarter 2021 Universal Service Contribution Factor*, (Sept. 10, 2021) https://www.fcc.gov/document/usf-proposed-4th-quarter-

---

[3]USAC provides the projections in a report to the FCC. *See, e.g.*, USAC, *Federal Universal Service Support Mechanisms Fund Size Projections for Fourth Quarter 2021* (Aug. 2, 2021), https://www.usac.org/wp-content/uploads/about/documents/fcc-filings/2021/fourth-quarter/financials/USAC-4Q2021-Federal-Universal-Service-Mechanism-Quarterly-Demand-Filing_Final.pdf [hereinafter *USAC Q4 2021 Projected Fund Size*].

[4]USAC provides the data in a report to the FCC. *See, e.g.*, USAC, *Federal Universal Service Support Mechanisms Quarterly Contribution Base for the Fourth Quarter 2021* (Sept. 1, 2021), https://www.usac.org/wp-content/uploads/about/documents/fcc-filings/2021/fourth-quarter/financials/USAC-4Q2021-Universal-Service-Contribution-Base-Filing.pdf [hereinafter *USAC Q4 2021 Projected Contribution Base*].

contribution-factor-291-percent [hereinafter *Q4 2021 Contribution Factor*].  The public had until September 24, 2021 to submit comment and objections.

Petitioners filed a comment on September 23, 2021.  *Comments and Objections of Consumers' Rsch. et al.*, CC Docket No. 96-45 (Sept. 23, 2021), https://www.fcc.gov/ecfs/document/109231271512688/1.  Petitioners requested that the FCC set the contribution factor at 0%.  *Id.* at 5.  Petitioners' comment listed numerous reasons why they believed that the USF violates the law, including arguments that it violates the nondelegation doctrine, the private-nondelegation doctrine, the Appointments Clause, and the Administrative Procedure Act's ("APA") requirements for rule promulgations.  *Id.* at 2–5.

The FCC approved the fourth quarter 2021 contribution factor on September 24, 2021.  On September 30, 2021, Petitioners filed a Petition for Review in this court seeking review of whether the FCC's approval of the *Q4 2021 Contribution Factor* "exceeds the FCC's statutory authority and violates the Constitution and other federal laws."  D. 1-2 (Pet. at 3).  Petitioners raised many of the same challenges made in their comment.  *Id.* at 3–5.  In their brief filed with this court, Petitioners narrowed their challenge and addressed their nondelegation-doctrine and private-nondelegation-doctrine arguments.

## II.  STANDARD OF REVIEW

We review de novo constitutional claims raised in a petition for review.  *Consumers' Rsch.*, 63 F.4th at 445; *see also United States v. Bowers*, 594 F.3d 522, 527 (6th Cir. 2010); *Gutierrez v. Sessions*, 887 F.3d 770, 774 (6th Cir. 2018).  We also review de novo questions of statutory interpretation and questions of law.  *Boler v. Earley*, 865 F.3d 391, 401 (6th Cir. 2017).

## III.  DISCUSSION

### A.  JURISDICTION

We conclude that Petitioners have Article III standing under *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).  Petitioner Cause Based Commerce, Inc. ("CBC") has Article III standing because, as a carrier, it "is a regulated entity required to contribute directly to the Universal Service Fund, with the amount likewise based on the Contribution Factor."  Pet'rs Br.

at 30. According to CBC's President David Condit, CBC "contributes directly to the Universal Service Fund and has done so during all relevant times for this suit, including the fourth quarter of 2021," and "plans to continue" doing so and remains subject to the contribution requirement. D. 46-2, Ex. 1 (Decl. of David W. Condit) ¶ 4; *see also id.* ¶¶ 2, 5. When the party is "an object of the action . . . at issue . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62. Here, CBC's President's testimony demonstrates an actual, concrete, and particularized injury of fact that is fairly traceable to the FCC's conduct and is redressable by a favorable judicial ruling. *See id.* at 560–61. CBC has established Article III standing. We can review a petition for review when one petitioner has standing. *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006). Thus, Petitioners have satisfied *Lujan*'s standing requirements.

The parties contest, however, whether Petitioners have jurisdiction to file their Petition in this court pursuant to the Administrative Orders Review Act, also referred to as the Hobbs Act, 28 U.S.C. § 2342. Under § 2342, "federal courts of appeals have 'exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of' certain 'final orders of the Federal Communication[s] Commission.'" *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2053 (2019) (quoting 28 U.S.C. § 2342(1)). "Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies." 28 U.S.C. § 2344.

The Hobbs Act imposes a jurisdictional limit. *Leyse v. Clear Channel Broad., Inc.*, 545 F. App'x 444, 447, 454 (6th Cir. 2013); *Consumers' Rsch.*, 63 F.4th at 446; *see also Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 437 (2011) (considering another jurisdictional question but stating that "[t]he Government also notes that lower court decisions have uniformly held that the Hobbs Act's 60–day time limit for filing a petition for review of certain final agency decisions, 28 U.S.C. § 2344, is jurisdictional"); *United States v. Marshall*, 954 F.3d 823, 829 (6th Cir. 2020) (same).

"Generally, administrative orders are final and appealable if they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process."

*Leyse*, 545 F. App'x at 455 n.5 (quoting *Multistar Indus., Inc. v. Dep't of Transp.*, 707 F.3d 1045, 1052 (9th Cir. 2013)).   But the Hobbs Act is complicated, and the answer to the jurisdiction inquiry varies depending on the agency, the type of agency decision at issue, and the facts of the case.  A one-size-fits-all approach does not work.

The FCC argues that it did not issue a reviewable final order within sixty days of Petitioners' challenge.  First, the FCC asserts that Petitioners' challenge is many years too late given that their Petition actually challenges the FCC's regulations and orders from the 1990s and 2011 regarding the contribution method and USAC rather than the *Q4 2021 Contribution Factor* itself.  Second, the FCC contends that the challenge is simultaneously *unripe* because the final order is USAC's invoice applying the quarterly contribution factor to a carrier's covered revenue, rather than the FCC's approval of the quarterly contribution factor.  FCC Br. at 24–27. We disagree and hold that Petitioners have carried their burden of establishing jurisdiction under the Hobbs Act.  *See Lujan*, 504 U.S. at 561 (placing burden of establishing jurisdiction on party opposing dismissal); *Hautzenroeder v. DeWine*, 887 F.3d 737, 740 (6th Cir. 2018) (same).

First, the FCC's regulations indicate that the *Q4 2021 Contribution Factor* is a final order consistent with the Hobbs Act.  The FCC's regulations state that an FCC "action shall be deemed *final*, for purposes of . . . judicial review, on the date of public notice as defined in [47 C.F.R.] § 1.4(b)."   47 C.F.R.  § 1.103(b)  (emphasis added); *see also Cal. Ass'n of the Physically Handicapped, Inc. v. FCC*, 833 F.2d 1333, 1334 (9th Cir. 1988).  The *Q4 2021 Contribution Factor* is a "Public Notice" that the FCC released and issued on September 10, 2021, and approved on September 24, 2021.  *Q4 2021 Contribution Factor* at 1; Fed. Commc'ns Comm'n, *USF Proposed 4th Quarter Contribution Factor is 29.1 Percent*, https://www.fcc.gov/document/usf-proposed-4th-quarter-contribution-factor-291-percent.   Though "[t]he particular label placed upon" the type of agency decision "is not necessarily conclusive, for it is the substance of what the Commission has purported to do and has done which is decisive," *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 416 (1942), the fact that the FCC prescribes that an order becomes final for the purposes of judicial review based "on the date of public notice," 47 C.F.R. § 1.103(b), constitutes support for

jurisdiction in this instance.  Thus, Petitioners filed their Petition for Review well within sixty days of both dates.[5]

Nonetheless, even if the *Q4 2021 Contribution Factor* is not a final order, we agree with Petitioners that the *Q4 2021 Contribution Factor* reapplies prior final FCC actions that restart the sixty-day clock.  Reply Br. at 8–9.  *See ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 278 (1987) (noting in the context of agency's reopening of a proceeding and reissuing of an order that reaffirmed legal obligations in a prior agency order that an agency's subsequent order "is reviewable on its merits" under the Hobbs Act "even if it merely reaffirms the rights and obligations set forth in the original order").   When considering how the reapplication of regulations implicates Hobbs Act jurisdiction, the D.C. Circuit stated that the "statutory time limit restricting judicial review of [an FCC] action is applicable only to cut off review directly from the order promulgating a rule.  It does not foreclose subsequent examination of a rule where properly brought before this court for review of further Commission action applying it." *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958).  *Functional Music* explained that "administrative rules and regulations," unlike some other types of final agency action, "are capable of continuing application," and "limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity."  *Id.*  Thus, *Functional Music* found that Hobbs Act jurisdiction exists when a petitioner files a challenge within sixty days of a reapplication of the underlying rule.  *See id.*  Our circuit has addressed when the clock restarts in a slightly different context.  *See Ohio Pub. Int. Rsch. Grp., Inc. v. Whitman*, 386 F.3d 792, 799–800 (6th Cir. 2004) (considering analogous jurisdictional requirements).   We explained that when an agency is "merely s[eeking] public comment on whether . . . programs were acting in accordance with [underlying] regulations" without demonstrating an "indication that the [agency] was reconsidering any underlying regulations," the agency is not republishing the rule and it "d[oes] not reopen the sixty-day notice and comment period."  *See id.* at 800.  *Ohio Public Interest Research Group* did not consider instances in which the new agency action reapplied the underlying rule.  *See id.* at 799–800.

---

[5]Because the Petition is timely regardless of whether the FCC's September 10, 2021 release and issuance or the FCC's September 24, 2021 approval triggers the final order date, we need not decide which date controls.

In this specific circumstance, to the extent the *Q4 2021 Contribution Factor* itself is not a final order, Petitioners' challenge to the FCC's constitutional authority to implement § 254, reapply its prior regulations, and issue the *Q4 2021 Contribution Factor* restarts the sixty-day clock. *See Functional Music*, 274 F.2d at 546. Every quarter, the FCC reapplies 47 C.F.R. § 54.709 to determine a *new* contribution factor for the next quarter and impose a new legal obligation. The *Q4 2021 Contribution Factor* itself states that upon its approval, "[c]ontribution payments are due on the dates shown on the invoice" issued by USAC, and also details the sanctions that carriers will face if they fail to pay the contribution or pay the contribution late. *Q4 2021 Contribution Factor* at 4 ("Contributors will pay interest for each day for which the payments are late. Contributors failing to pay contributions in a timely fashion may be subject to the enforcement provisions of the Communications Act of 1934, as amended, and any other applicable law."). It is only because the FCC approves the contribution factor each quarter that USAC can then issue the invoice,[6] indicating that the legal obligation to pay the contribution arises when the FCC approves the contribution factor.[7] We see this particular instance as distinct from an agency's "mere[] [solicitation of] public comment[s] on whether . . . [a] program[] . . . act[s] in accordance with [underlying] regulations," *see Ohio Public Interest Research Group*, 386 F.3d at 800. And we do not "normally . . . require plaintiffs to bet the farm . . . by taking the violative action before testing the validity of the law." *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 822 (6th Cir. 2015) (second alteration in original) (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490–91 (2010)) (considering different statutory time limitation); *see also Weaver v. Fed. Motor Carrier Safety Admin.*, 744 F.3d 142, 145 (D.C. Cir. 2014) (noting that challenges after sixty days of the original agency action may be permitted "when an

---

[6]The FCC's argument that a legal obligation arises only when USAC issues an invoice is unavailing as *only one* petitioner is a carrier who may receive an invoice. The other consumer petitioners ultimately pay a specific fee on their regular service bill because of the contribution factor that the FCC approves for that quarter without ever receiving an invoice. Reply Br. at 15; Oral Arg. at 29:28–30:05.

[7]Though certainly not dispositive, we find further support that the *Q4 2021 Contribution Factor* is an application of prior authority given that the FCC's Public Notices publishing the contribution factors are listed as one proceeding on the FCC's docket, Proceeding CC 96-45, created on March 20, 1996. *See* Fed. Commc'ns Comm'n, Proceeding Docket No. 96-45, https://www.fcc.gov/ecfs/search/search-filings/results?q=(proceedings.name:(%2296-45%22)) (last visited May 4, 2023); Fed. Commc'ns Comm'n, *Filing Detail DA-21-1134A1*, https://www.fcc.gov/ecfs/search/search-filings/filing/0910088680112 (last visited May 4, 2023).

agency seeks to apply the rule" and "those affected may challenge that application" without awaiting "formal 'enforcement actions'").  Finally, we find significant that Petitioner CBC became a covered carrier only in 2006, *see* D. 46-2, Ex. 1 (Decl. of David W. Condit) ¶ 3, and Petitioner Jeremy Roth first paid a universal-service fee on his phone bill around 2016, *see* D. 46-2, Ex. 3 (Decl. of Jeremy Roth) ¶ 3,—years after the FCC adopted the rules it now reapplies in the *Q4 2021 Contribution Factor*.  *See PDR*, 139 S. Ct. at 2062 (Kavanaugh, J., concurring). We therefore hold that this Petition for Review is timely.

## B.  NONDELEGATION DOCTRINE

Petitioners argue that § 254 of the Telecommunications Act of 1996 violates the nondelegation doctrine.  We, like our colleagues in the Fifth and D.C. Circuits, disagree. *Consumers' Rsch.*, 63 F.4th at 450 ("[Section] 254 does not violate the nondelegation doctrine."); *Rural Cellular*, 685 F.3d at 1091 ("[S]ection 254 of the Act clearly provides an intelligible principle.").

The Constitution vests all legislative power in Congress and, under the nondelegation doctrine, bars Congress from "transfer[ring] to another branch 'powers which are strictly and exclusively legislative.'"  *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825)).  The Constitution, however, allows "Congress [to] obtain[] the assistance of its coordinate Branches," *Mistretta v. United States*, 488 U.S. 361, 372 (1989), and to "confer substantial discretion on executive agencies to implement and enforce the laws." *Gundy*, 139 S. Ct. at 2123.  "The nondelegation doctrine is rooted in the principle of separation of powers." *Mistretta*, 488 U.S. at 371.

Under the nondelegation doctrine, we look for an intelligible principle.  "So long as Congress 'shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Id.* at 372 (alterations in original) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)); *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 218 (1989) (explaining no constitutional violation exists "so long as Congress provides an administrative agency with standards guiding its actions such that a court could

'ascertain whether the will of Congress has been obeyed'" (quoting *Mistretta*, 488 U.S. at 379));
*Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001).  The intelligible-principle test
tells us that "Congress . . . may delegate no more than the authority to make policies and rules
that implement its statutes."  *Loving v. United States*, 517 U.S. 748, 771 (1996).  It is
"constitutionally sufficient if Congress clearly delineates the general policy, the public agency
which is to apply it, and the boundaries of this delegated authority."  *Am. Power & Light Co. v.
SEC*, 329 U.S. 90, 105 (1946).  Even when these delegations are "broad," the Court has upheld
Congress's power to delegate.  *Mistretta*, 488 U.S. at 373–74.

The intelligible-principle test has long recognized "that in our increasingly complex
society, replete with ever changing and more technical problems, Congress simply cannot do its
job absent an ability to delegate power under broad general directives."  *Id.* at 372; *Gundy*,
139 S. Ct. at 2123 (explaining that the Court's holdings recognize these considerations "time and
again").  The Supreme Court has struck down a statute for lacking an intelligible principle on
only two occasions:  *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), struck down a statute
that "provided literally no guidance for the exercise of discretion," *Whitman*, 531 U.S. at 474,
and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), struck down a statute
that "conferred authority to regulate the entire economy on the basis of no more precise a
standard than stimulating the economy by assuring 'fair competition,'" *Whitman*, 531 U.S. at
474.

*Gundy* describes the methodology for analyzing a Congressional delegation.  We employ
statutory interpretation to answer "[t]he constitutional question [of] whether Congress has
supplied an intelligible principle to guide the delegee's use of discretion."  139 S. Ct. at 2123.
We construe the "challenged statute's meaning" by analyzing "what task it delegates and what
instructions it provides."  *Id.* (noting that prior precedents have evaluated a statute's purpose,
factual background, and context); *see also Consumers' Rsch.*, 63 F.4th at 447.  If necessary, we
next consider whether the statute "sufficiently guides" the agency's discretion.  *Gundy*, 139 S.
Ct. at 2123.

"[T]he degree of agency discretion that is acceptable varies according to the scope of the
power congressionally conferred."  *Whitman*, 531 U.S. at 475 (explaining that the specifics of

each statute affect the inquiry but noting the broad leeway Congress has, *id.* at 474–75).  Our inquiry therefore homes in on the statute's specific features, *see id.*, but we apply one universal intelligible-principle test regardless of the type of statute at issue.  *See Skinner*, 490 U.S. at 220, 222–23 (rejecting an alternative nondelegation standard for purported delegations of Congress's taxing power) ("[Neither] the text of the Constitution [n]or the practices of Congress require the application of a different and stricter nondelegation doctrine in cases where Congress delegates discretionary authority to the Executive under its taxing power."  *Id.* at 222–23); *J.W. Hampton*, 276 U.S. at 409 (rejecting the argument that precedent treats differently delegations regarding "levy[ing] taxes and fix[ing] customs duties" and explaining that "[t]he authorities make no such distinction").[8]

Petitioners argue that § 254 violates the nondelegation doctrine because Congress neither capped the amount that the FCC may raise in contributions for the Fund nor imposed a formula for how to calculate the contributions to the Fund.  They argue that the delegations scrutinized in *Skinner* and *J.W. Hampton* survived constitutional muster because, there, Congress capped the fee amounts to be collected and provided a formula for calculating the fee or the customs duty.  Petitioners misconstrue *Skinner* and *J.W. Hampton*.

In *Skinner*, a unanimous Supreme Court analyzed a statutory scheme similar to 47 U.S.C. § 254 in what the Court referred to as a non-serious nondelegation-doctrine challenge.  490 U.S. at 219 (recognizing the appellant's only serious challenge concerned whether a heightened nondelegation doctrine applied when Congress delegates its taxing power before rejecting that challenge, *id.* at 220).  *Skinner* considered Section 7005 of the Consolidated Omnibus Budget Reconciliation Act of 1985, which "directs the Secretary of Transportation . . . to 'establish a

---

[8]Because no alternative intelligible-principle standard applies, it is unnecessary to classify the contributions as a "tax" or a "fee."  *Skinner*, 490 U.S. at 222–23.  We note, however, that in other contexts, courts have determined that contributions to the Universal Service Fund are fees, not taxes.  *E.g.*, *Rural Cellular*, 685 F.3d at 1091 ("Nor is the Act as interpreted by the Commission an unconstitutional delegation of the Congress's authority under the Taxing Clause to 'lay and collect Taxes' because the assessment of contributions from carriers is not a tax."); *see also TOPUC I*, 183 F.3d at 427 & n.52 (dismissing tax argument and stating "the universal service contribution qualifies as a fee because it is a payment in support of a service (managing and regulating the public telecommunications network) that confers special benefits on the payees.").

Like with all nondelegation challenges, we consider the at-issue statute's specific features, including the very features Petitioners believe render § 254 a "revenue-raising" statute.

schedule of fees based on the usage, in reasonable relationship to volume-miles, miles, revenues, or an appropriate combination thereof, of natural gas and hazardous liquid pipelines.'" *Id.* at 214 (quoting Pub. L. 99–272, 100 Stat. 82, § 7005(a)(1)). The Court explained that § 7005 was "one of a number of recent congressional enactments designed to make various federal regulatory programs partially or entirely self-financing." *Id.* at 215.

The Court in *Skinner* "ha[d] no doubt that" § 7005 contained sufficient Congressional "restrictions . . . on the Secretary's discretion" and supplied an intelligible principle given that "Congress delimited the scope of [the agency's] discretion with much greater specificity than in [other constitutional] delegations." *Id.* at 219–20. It provided examples that highlighted this "delimited" discretion. *Id.* at 219. For instance, Congress limited the Department of Transportation's discretion by restricting from whom the agency could collect fees and the activities on which the agency could spend the fees. *Id.* Congress further limited the agency's discretion by requiring that the agency apply a uniform approach to setting fees rather than permitting the "set[ting of] fees on a case-by-case basis." *Id.* As in 47 U.S.C. § 254, Congress provided a principle by which to guide the Department of Transportation in setting fees, requiring that the fees "bear a 'reasonable relationship' to" an enumerated list of criteria the agency used to set the fee. *Id.* Unlike 47 U.S.C. § 254, § 7005 stated that "at no time shall the aggregate of fees received for any fiscal year . . . exceed 105 percent of the aggregate of appropriations made for such fiscal year for activities to be funded by such fees." *Id.* at 215 (quoting Pub. L. 99–272, 100 Stat. 82, § 7005(d)). Petitioners argue that the omission of § 7005's last feature dooms 47 U.S.C. § 254. Pet'rs Br. at 40–41. But *Skinner* determined— without "[any] doubt"—that the statute *easily* "satisfied" the intelligible-principle test; the Court did not hold, or even imply, that an intelligible principle required a price cap. *See Skinner*, 490 U.S. at 220; *see also id.* at 218–19. Justice Scalia repeated this very point in *Whitman* when he explained that the Supreme Court "ha[s] never demanded . . . that statutes provide a 'determinate criterion'" identifying "how much . . . is too much." 531 U.S. at 475 (quoting *Am. Trucking Ass'ns, Inc. v. EPA*, 175 F.3d 1027, 1034 (D.C. Cir.), *aff'd in part, rev'd in part sub nom. Whitman*, 531 U.S. 457 (2001)).

*J.W. Hampton*, 276 U.S. 394, similarly did not imply that absent "a precise formula," Pet'rs Br. at 39, a statute lacks an intelligible principle. The statute at issue in *J.W. Hampton* addressed customs duties and allowed the President, upon an investigation, to adjust Congressionally set duty rates to equalize the difference between the production costs in the United States and foreign production costs through a proclamation. 276 U.S. at 401. The statute's purpose in seeking rate equalization was to "secure revenue" and "enable domestic producers to compete on terms of equality with foreign producers in the markets of the United States." *Id.* at 404. Because Congress "doubted" its ability "to fix with exactness this difference" and faced "difficulty in practically determining what that difference is," it turned to the Executive. *Id.* at 404–05. Of course, because the statute sought a mathematical goal of rate equalization (adjustments stemming from the difference between two numbers), it included general mathematics. *Id.* at 401–02, 411. In addition to the broader mathematical principle of rate equalization, Congress provided the President with four items to "take into consideration," *id.* at 401, when "ascertaining the differences in costs of production," *id.* at 403. In upholding the statute, the Court considered Congress's purpose and the mechanisms the statute used to accomplish that purpose, scrutinized the degree of guidance provided in the statute, and then found guidance in part from the broad mathematics of rate equalization. *See id.* at 404–09.

*J.W. Hampton* does not stand for the proposition that delegations lacking some sort of Congressional formula lack sufficient guidance. *See id.* Neither do other precedents. *See, e.g.*, *Lichter v. United States*, 334 U.S. 742, 785 (1948) ("It is not necessary that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program.") (upholding statute and explaining "the purpose of the [statute] and its factual background establish a sufficient meaning for 'excessive profits' as those words are used in practice").

Next, Petitioners argue that 47 U.S.C. § 254 lacks any real limits and affords the FCC too much discretion. They assert that § 254 offers no "meaningful definitions" and has "standardless" principles. Pet'rs Br. at 35, 44. *American Power* informs us that a statute's "standards need not be tested in isolation," and that standards "derive much meaningful content

from the purpose of the Act, its factual background and the statutory context in which they appear." 329 U.S. at 104. The FCC points to numerous statutory provisions that provide an intelligible principle and restrict the FCC's discretion in implementing the USF. Looking to § 254 to analyze "what task it delegates and what instructions it provides" and determining whether Congress "sufficiently guide[d]" the FCC's discretion, *Gundy*, 139 S. Ct. at 2123, we hold that Congress provided an intelligible principle and its delegation does not violate the separation of powers.

### 1. Subsection 254(b)'s Principles

Congress provided its principles for universal service in § 254(b). Contrary to Petitioners' assertion that these principles are "standardless" and nothing more than "tautologies," Pet'rs Br. at 44, Congress's principles are fairly detailed and instructive—especially relative to other statutes that have been upheld as constitutional. *See Whitman*, 531 U.S. at 474 (listing principles the Supreme Court has found intelligible and collecting cases); *Lichter*, 334 U.S. at 786 (same). These principles are essentially the goals of universal service and, alongside other provisions of § 254, limit the FCC in how it funds the USF. Therefore, we agree with the Fifth Circuit that Petitioners' "position is untenable." *Consumers' Rsch.*, 63 F.4th at 448.

In § 254(b), Congress first provided a high-level goal for universal service when it instructed that the FCC and the Joint Board work towards "the preservation and advancement of universal service." Congress did not end with this high-level goal but enumerated specific principles of universal service. *Id.* It mandated that, in working to effectuate this goal, the FCC and the Joint Board "*shall*" abide by numerous enumerated principles when effectuating the congressional "policies for the preservation and advancement of universal service." 47 U.S.C. § 254(b) (emphasis added).[9] When Congress then listed each principle individually, it stopped using "shall" and started using "should." *E.g.*, *id.* § 254(b)(1) ("Quality services *should* be available at just, reasonable, and affordable rates." (emphasis added)). Reading these two

---

[9]The entire provision reads: "The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles." 47 U.S.C. § 254(b).

provisions together, as other courts have, indicates that Congress *required* that the FCC base its efforts to preserve and advance universal service on the enumerated principles while allowing the FCC to then "*balance* [each] principle[] against one another when they conflict." *See Qwest Corp. v. FCC*, 258 F.3d 1191, 1200 (10th Cir. 2001) (emphasis added).

The enumerated principles identify specific goals and provide a detailed framework for universal service. "Section 254 expressly requires the FCC to ensure that telecommunications services are: (1) of decent quality and reasonably priced; (2) equally available in rural and urban areas; (3) supported by state and federal mechanisms; (4) funded in an equitable and nondiscriminatory manner; (5) established in important public spaces (schools, healthcare providers, and libraries); and (6) available broadly across all regions in the nation." *Consumers' Rsch.*, 63 F.4th at 448. Thus, some principles focus on the **availability, accessibility, and affordability of service** by requiring that the FCC pursue services that are of sound quality and affordable; accessible regardless of region; and of comparable access and rates for low-income consumers, rural consumers, and consumers in areas where service is costly. *See* 47 U.S.C. § 254(b)(1)–(3). Other principles, such as those in § 254(b)(4)–(5), instruct on the **funding of universal service and creation of specific approaches** to "preserv[ing] and advanc[ing] universal service" by directing that "providers of telecommunications services" financially contribute to the USF by "mak[ing] an equitable and nondiscriminatory contribution," and requiring that there "be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service." *Id.* § 254(b)(4)–(5). And the principle articulated in § 254(b)(6) names **additional beneficiaries of the USF** (health care providers, schools, and libraries) that "should have access to advanced telecommunications services." *See id.* § 254(b)(6). And, of course, Congress indicated its support to continue addressing high-cost service and low-income communities' access to telecommunication services. *See id.* § 254(b)(3).

Together, these principles provide comprehensive and substantial guidance and limitations on how to implement Congress's universal-service policy, and in turn, how the FCC funds the USF. The principles direct the FCC on (1) **what** it must pursue: accessible, quality, and affordable service. (2) **How** the FCC must fund these efforts: by imposing carrier

contributions.   (3) **The method by which** the FCC must effectuate the goals of accessible, sound-quality, and affordable service:  by creating specific mechanisms for the Fund.  And (4) **to whom** to direct the programs:  by identifying the USF's mechanisms' beneficiaries.

Petitioners' argument that these principles are too abstract, "lofty," and "aspirational only" is unpersuasive.  Pet'rs Br. at 45 (quoting *TOPUC II*, 265 F.3d at 321).  Their citation to *TOPUC II*'s statements about the § 254(b) principles is inapplicable.  *TOPUC II* considered whether the FCC's CALLS Order, which in part raised a price cap on the amount that "end-users of basic local service pay" on their monthly telephone bills, *TOPUC II*, 265 F.3d at 318, violated the *statute's* "requirement of affordable universal access," *id.* at 320.   The court applied *Chevron*'s two steps, asking "whether Congress has spoken directly on the precise question at issue," and if not and § 254 was ambiguous, then asking whether the FCC's "answer is based upon a permissible construction."  *Id.* (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842–43 (1984)).  *TOPUC II* did *not* evaluate the constitutionality of Congress's delegation, *see generally id.*, but rather considered whether the FCC's price cap violated the Act's (specifically, § 254(b)(1)'s and § 254(i)'s) principles regarding the "just, reasonable, and *affordable* rates" of universal service.  *Id.* at 320–21; *see also* 47 U.S.C. § 254(b)(1) (emphasis added), 254(i) (emphasis added).

When explaining why the court determined that the statute was ambiguous under *Chevron*'s step one and required moving on to *Chevron*'s step two, *TOPUC II* explained that it had "previously analyzed § 254(b) under *Chevron* step-two because the listed principles use 'vague, general language,' rendering the section ambiguous" under *Chevron*.  265 F.3d at 321 (quoting *TOPUC I*, 183 F.3d at 421).  The Fifth Circuit found that, because the principle of affordability was an "*aspirational guideline* that must be carefully balanced with other statutory objectives," when the FCC acted in a manner that served other principles more than it served *affordability*, it did not violate § 254.  *Id.* (emphasis added).  Again, *TOPUC II* did not address the constitutional question about Congress's delegation and did not hold that § 254's principles were too lofty or aspirational to provide an intelligent principle or limitation on the FCC's discretion.  *Id.* at 320–22.  And, even in the statutory context, Congress's decision to require that the FCC consider these principles and balance them against one another affords the FCC

"considerable"—but "not absolute"—discretion.  *See TOPUC I*, 183 F.3d at 434 (reviewing FCC's interpretation of § 254 and commenting on § 254's limits on the FCC's discretion).

Subsection 254(b)(7)'s final principle—requiring that the Joint Board and the FCC "shall base policies for the preservation and advancement of universal service on . . . [s]uch other principles" that they "determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter"—does *not* strip away the intelligible principle and the limits on the FCC's discretion that Congress imposed in the first six principles and throughout § 254.  As the Fifth Circuit recently noted, "the statute enables, and likely obligates, [the FCC] to add principles 'consistent with' § 254's overall purpose." *Consumers' Rsch.*, 63 F.4th at 448 (quoting 47 U.S.C. § 254(b)(7)).  Thus, any new principle could only be "necessary and appropriate for the protection of the public interest, convenience, and necessity" and must be "consistent with" § 254's detailed scheme for universal service. 47 U.S.C. § 254(b)(7).

Further, this final principle allows the FCC to comply with its mandate to account for the advances to the world of "evolving" telecommunications.  *See* 47 U.S.C. § 254(c)(1).  Enabling the FCC to account for "evolving" telecommunications reflects the exact rationale that underpins the nondelegation doctrine.  *See Gundy*, 139 S. Ct. at 2123.  Caselaw acknowledges that "in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 372; *Am. Power*, 329 U.S. at 105 (explaining this precedent "is a reflection of the necessities of modern legislation dealing with complex economic and social problems"); *Gundy*, 139 S. Ct. at 2123 (explaining that the Court's holdings recognize these considerations "time and again").  Congress's decision to grant an agency the ability to address new concerns while still constricting the agency's discretion to do so within the statute's purpose and principles does not turn a statute with an intelligible principle into an unconstitutional delegation.

### 2. Section 254's Other Provisions and the Statute's Purpose

Section 254's other provisions also limit the FCC's discretion over the USF.  For instance, § 254(c) limits the FCC in deciding **which kinds of telecommunications services** are

supported by the USF.  By doing so, § 254(c) "limits distribution of USF funds" for specific services.  *Consumers' Rsch.*, 63 F.4th at 450.  Subsection 254(c) narrows the universe of telecommunications services eligible for inclusion by identifying the characteristics of the permissible types of services:  Only "telecommunications services" that have been evaluated for the four factors specified by Congress may be included as services in the Fund.  Specifically, § 254(c) mandates that the FCC, when identifying which telecommunications services are included, "*shall* consider the extent to which such telecommunications services . . . are [(A)] essential to education, public health, or public safety," (B) popular with "a substantial majority of residential customers," (C) "deployed in public telecommunications networks by telecommunications carriers[,] and" (D) "consistent with the public interest, convenience, and necessity."  47 U.S.C. § 254(c)(1) (emphasis added).

The FCC also points to the relationship between the first three factors and the fourth factor as a further limitation.  FCC Br. at 38–39.  The first three factors (the telecommunications service's essentiality, popularity, and the degree of deployment) are factual questions to examine.  *Id.*  The fourth factor then tethers those factual factors to § 254's purpose and statutory context by mandating that the telecommunications services included be "consistent with the public interest, convenience, and necessity."  47 U.S.C. § 254(c)(1)(D); *see also* FCC Br. at 38– 39.  The FCC argues that this relationship is evidence of § 254's purpose, "factual background, and the statutory context."  FCC Br. at 39 (quoting *Am. Power*, 329 U.S. at 104).  As *American Power* explained, a statute's standards "derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear."  329 U.S. at 104.  Here, these limits on which telecommunications services are eligible for inclusion in the Fund lend further meaning to the statute's standard governing universal-service principles and impose additional constraints in determining which services the Fund can include and collect contributions for.

Congress's **method of funding USF's mechanisms** yet again limits the FCC's discretion.  In § 254(d) Congress (1) mandated *who* pays for the universal-service mechanisms and (2) provided a general principle for *how* the FCC should calculate the amount each carrier must contribute.  "[T]o preserve and advance universal service," § 254(d) requires that "[e]very

telecommunications carrier that provides interstate telecommunications services shall contribute[] on an equitable and nondiscriminatory basis" to the Fund. That the contributions must be "on an equitable and nondiscriminatory basis" prevents case-by-case contribution amounts and equalizes the obligation on carriers. *Id.*

More limits on the FCC's discretion exist in § 254(e), which "limits distribution of USF funds to eligible communication carriers under § 214(e)—and even those carriers may only receive support 'sufficient to achieve the purposes of' § 254." *Consumers' Rsch.*, 63 F.4th at 450 (quoting 47 U.S.C. § 254(e)). There are limits on **which "telecommunications carrier[s] . . . shall be eligible to receive specific Federal universal service support**." 47 U.S.C. § 254(e) (emphasis added). Section 254 also restricts **how eligible carriers spend the support funds** they receive by limiting support spending to "only . . . the provision, maintenance, and upgrading of facilities and services for which the support is intended," and instructs the FCC that it should make "[a]ny such support . . . explicit and *sufficient* to achieve the purposes of this section." *Id.* (emphasis added); *see also Alenco*, 201 F.3d at 620.

Not only does subsection 254(e) provide the FCC additional guidance for implementing universal service, but also its "sufficiency" command places a soft cap on the size and budget of the program, allowing growth no larger than what is "sufficient to achieve the purposes of" universal service. 47 U.S.C § 254(e); *see also TOPUC I*, 183 F.3d at 412 ("[T]he plain language of § 254(e) makes sufficiency of universal service support a direct statutory command rather than a statement of one of several principles."); *Alenco*, 201 F.3d at 620 ("[E]xcessive funding [of the USF] may itself violate the sufficiency requirements of the Act."). *Alenco* explained that "[b]ecause universal service is funded by a general pool subsidized by all telecommunications providers—and thus indirectly by the customers—excess subsidization in some cases may detract from universal service by causing rates unnecessarily to rise, thereby pricing some consumers out of the market." *Id.*

Section 254 also limits the **type of beneficiaries of the USF**. Under § 254, universal-service efforts must address high-cost areas and low-income communities. 47 U.S.C. § 254(b)(3). Subsection 254(h) also includes "a new statutory mandate to subsidize support for certain beneficiaries"—rural health care providers, schools, and libraries. *TOPUC I*, 183 F.3d at

440; *see also* 47 U.S.C. § 254(h).   Section 254 requires telecommunications carriers, upon request, to provide telecommunications services to rural health care providers and includes a specific formula that must be used to calculate the subsidies the FCC issues to these carriers for these services.   47 U.S.C. § 254(h)(1)(A).   With regard to schools and libraries, Congress specifically required that telecommunications carriers serving certain geographical areas provide schools and libraries with services "for educational purposes at rates less than the amounts charged for similar services to other parties" upon request.   *Id.* § 254(h)(1)(B).   Section 254 instructs the FCC and States to set the discount by "determin[ing what] is appropriate and necessary to ensure affordable access to and use of such services by such entities."   *Id.*   Congress provided two alternative formulas for how carriers would receive subsidies for their discounted service.   *Id.* § 254(h)(1)(B)(i)–(ii).   These two provisions show that Congress kept for itself the decision of how much carriers could ultimately receive for the services they provide to rural health care providers and schools and libraries—market-value or discounted services, respectively.   Finally, further limits exist with regards to "[a]dvanced services" in § 254(h)(2).

Congress has historically pursued universal service since before 1934.   *See* 47 U.S.C. § 151 (creating the FCC in 1934 "to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges."); *TOPUC I*, 183 F.3d at 405–06.   We find even more evidence of an intelligible principle in § 254 from Congress's consistent intention and the statute's purpose.   *See Am. Power*, 329 U.S. at 104.   Petitioners' dissatisfaction and disagreement with Congress's and the FCC's policy choices "does not translate to a constitutional or statutory violation."   *Consumers' Rsch.*, 63 F.4th at 449 n.4.   "Rather than leave the FCC with '*no guidance* whatsoever,' Congress provided ample direction for the FCC in § 254."   *Id.* at 448–49 (quoting *Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022)).   Section "254 sets out the FCC's obligations with respect to administration of the USF and the FCC, in turn, calculates what funds are necessary to satisfy its obligations."   *Id.* at 450.   We therefore conclude that § 254(b)'s principles, Congress's numerous details and limitations on the FCC's implementation of the USF throughout the remainder of § 254, the statute's purpose, and Congress's history of pursuing universal service clearly articulate an intelligible principle and sufficiently limit the FCC's

discretion. *See id.* at 447–50; *Rural Cellular*, 685 F.3d at 1091 ("[S]ection 254 of the Act clearly provides an intelligible principle to guide the Commission's efforts, viz., 'to preserve and advance universal service.'"). We hold that § 254 does not violate the nondelegation doctrine.

## C. PRIVATE-NONDELEGATION DOCTRINE

The private-nondelegation doctrine addresses the Constitution's bar on the government's delegation of "unchecked legislative . . . power" to private entities. *Oklahoma v. United States*, 62 F.4th 221, 228 (6th Cir. 2023); *see also Carter v. Carter Coal Co.*, 298 U.S. 238, 310–11 (1936); *Currin v. Wallace*, 306 U.S. 1, 15–16 (1939). An unlawful delegation of authority to a private entity does not exist when the private entity "function[s] subordinate[] to the" agency while aiding the agency and the agency "has authority and surveillance over the activities of" the private entity. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940); *Texas v. Rettig*, 987 F.3d 518, 532 (5th Cir. 2021), *cert. denied sub nom. Texas v. Comm'r*, 142 S. Ct. 1308 (2022); *Consumers' Rsch.*, 63 F.4th at 450–51; *Oklahoma*, 62 F.4th at 229 ("[A] private entity must be subordinate to a federal actor in order to withstand a non-delegation challenge."). Our cases teach that "a private entity may aid a public federal entity that retains authority over the implementation of federal law" in numerous ways. *Oklahoma*, 62 F.4th at 228–29. For example, "[p]rivate entities may serve as advisors that propose regulations. And they may undertake ministerial functions, such as fee collection," *id.* at 229 (citations omitted), gather facts for the agency, or advise on or make policy recommendations to the agency, *see U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004).

We again agree with the Fifth Circuit that there is no private-nondelegation doctrine violation because USAC is subordinate to the FCC and performs ministerial and fact-gathering functions. *See Consumers' Rsch.*, 63 F.4th at 451–52. USAC is "expressly subordinate[d] . . . to the FCC," as "USAC 'may not make policy, interpret unclear provisions of the statute or rules, or interpret the intent of Congress.'" *Id.* at 451 (quoting 47 C.F.R. § 54.702(b)). The FCC has not afforded USAC any authority to make actual decisions or establish or define standards. *Cf. U.S. Telecom*, 359 F.3d at 568.

It is Congress that mandates that certain telecommunications carriers contribute to the USF's mechanisms. 47 U.S.C. § 254(b). It is the FCC that implements congressional mandates regarding which services are included in the USF, which types of entities provide interstate telecommunications, and the means of calculating each carrier's contribution amount. *See, e.g.*, 47 C.F.R. § 54.709(a) ("Contributions to the mechanisms . . . shall be based on contributors' projected collected end-user telecommunications revenues, and on a contribution factor determined quarterly by the Commission."). The FCC also maintains detailed regulations regarding USAC's structure. *See, e.g.*, 47 C.F.R. §§ 54.701, 54.703. And it is the FCC that calculates the contribution factor. *Id.* § 54.709(a)–(b).

In its subordinate role, USAC provides the FCC with fact-gathering, ministerial, and administrative support. It submits for *approval* to the FCC the underlying data and projections that the FCC then uses to calculate the contribution factor. *See Adkins*, 310 U.S. at 388, 399 (explaining that the mere power to make a proposal does not run afoul of the private-nondelegation doctrine). As the FCC explained, USAC calculates the Fund's projected expenses and the contribution base subject to "detailed and specific rules and instructions with the Commission's regulations." Oral Arg. at 24:17–34. For instance, USAC does so in compliance with "FCC rules that limit or cap available support" and formulas for certain programs and presents those figures for the FCC to accept or reject.[10] *See* FCC Br. at 53–54, 56; *Adkins*, 310 U.S. at 388.

Critically, the FCC is not bound by USAC's projections. 47 C.F.R. § 54.709(a)(3). Once it has received USAC's projections, the FCC issues a Public Notice publishing the proposed contribution factor and solicits public comment. *Id.*; *see also Adkins*, 310 U.S. at 388. With the close of the public-comment period, the FCC decides whether to approve the contribution factor. 47 C.F.R. § 54.709(a)(3). "If the [FCC] take[s] no action within fourteen (14) days of the date of release of the public notice . . . the contribution factor shall be deemed approved by the" FCC. *Id.*

---

[10]The FCC explains, as an example, how formulas guide USAC's calculation for the High Cost Support Mechanism: "[T]he FCC's rules for high-cost support provide precise formulas that USAC must use to calculate available support." FCC Br. at 13 (citing 47 C.F.R. § 54.303(a)(1) (total eligible annual operating expenses); *id.* § 54.1304(b) (safety net additive support); *id.* § 54.901(a) (Connect America Fund Broadband Loop Support)).

Petitioners argue that this process functions as a rubber stamp given their belief that "the FCC has [n]ever rejected or meaningfully modified" USAC's projections. Pet'rs Br. at 65. The FCC disagrees, arguing that it "has revised USAC's calculations to account for changes in Commission policy." FCC Br. at 58 (collecting sources). Regardless, an agency exercises its policymaking discretion with equal force when it makes policy by either "decid[ing] to act" or "decid[ing] *not* to act." *See Oklahoma*, 62 F.4th at 230. And the FCC's choice often to approve the projections does not change the fact that the FCC has the authority to reject or modify the projections or render USAC's projections as more than a mere proposal. As the FCC explained at oral argument, its decision often to approve USAC's projections reflects USAC's consistent adherence to the FCC's "detailed and specific rules and instructions within the Commission's regulation" when calculating the projections, the FCC's belief that USAC accurately calculates these projections, and satisfaction with USAC's performance. *See* Oral Arg. at 24:17–25:09. Additionally, "the FCC permits telecommunications carriers to challenge USAC proposals directly to the agency and often grants relief to those challenges." *Consumers' Rsch.*, 63 F.4th at 451. "Ultimately, the FCC only uses USAC's proposals after independent consideration of the collected data and other relevant information." *Id.* at 452.

USAC's role in handling the administrative functions of billing the contributing carriers and disbursing the universal-service funds, 47 C.F.R. § 54.702(b), is permissible ministerial support and further reflects its subordination to the FCC. *See Oklahoma*, 62 F.4th at 229 (explaining private entities "may undertake ministerial functions, such as fee collection"). USAC distributes invoices to each contributing carrier once the FCC approves the contribution factor; USAC applies the approved contribution factor to each "contributor's interstate and international end-user telecommunications revenues to calculate the amount of individual contributions." 47 C.F.R. § 54.709(a)(3); *see also id.* § 54.702(b). A private entity may assist an agency with this sort of ministerial support. Because USAC is appropriately subordinated to the FCC and serves a fact-gathering and ministerial function without exercising decision-making power, there is no private-nondelegation doctrine violation.

## IV.  CONCLUSION

The Constitution permits "Congress [to] obtain[] the assistance of its coordinate Branches," where it provides an intelligible principle. *Mistretta*, 488 U.S. at 371–72.  Congress provided the FCC with a detailed statutory framework regarding universal service.  That framework contains an intelligible principle because it offers nuanced guidance and delimited discretion to the FCC.  Section 254 therefore does not violate the nondelegation doctrine. Because of USAC's subordination to the FCC and its assistance with fact gathering and ministerial support, there is no private-nondelegation doctrine violation.  Accordingly, we **DENY** the Petition for Review.